***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Holmes. The appealing party has shown good grounds to reconsider the evidence. The Full Commission REVERSES the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. At all times relevant to this claim, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. The employment relationship existed between plaintiff and defendant-employer at the time of the alleged injury by accident.
3. The employer was insured for workers' compensation purposes by Key Risk Insurance Company on the date of the alleged injury by accident.
4. Plaintiff's average weekly wage on the date of the alleged injury by accident was $500.00, which yields a compensation rate of $333.35.
5. Plaintiff's alleged injury occurred on May 8, 2001.
6. Plaintiff last worked for employer on August 15, 2001.
7. The following exhibits were stipulated to by the parties:
a. Pretrial agreement
b. Medical records of plaintiff (Exhibit SA)
c. Industrial Commission forms (Exhibit SB)
d. Discovery responses (Exhibit SC)
e. Plaintiff's accident report (Plaintiff's Exhibit 1)
f. Plaintiff's statement about accident (Defendant's Exhibit 2)
8. The issues before the Commission are whether plaintiff sustained a compensable injury by accident on or about May 8, 2001; and, if so, to what, if any, disability benefits and medical treatment plaintiff is entitled.
 ***********
Based upon the competent evidence and stipulations of the parties, the Full Commission makes the follows:
 FINDINGS OF FACT
1. Plaintiff was hired as an electrician for defendant-employer in January 2001.
2. At the hearing before the Deputy Commissioner, plaintiff testified that on May 8, 2001 he felt a pop in his neck while lifting an exhaust fan motor weighing 250 pounds on the roof of a building with his supervisor, Lawrence Blakley. Plaintiff worked a full shift that day, as well as full shifts of work for the next three days. He did not seek medical treatment until May 14, 2001 when he called Mr. Blakley to tell him that he was experiencing neck pain and was going to the doctor. He did not report a work injury at that time, nor did he request permission to see a workers' compensation doctor.
3. Plaintiff was seen on May 14, 2001 at Richmond Internal Medicine where he was examined by Ms. Amy Chapman Alexander, a physician's assistant working under the direction of Dr. John Edward Flannery. On this visit, plaintiff gave a history of headache pain that began three weeks earlier and lasted three or four days. Plaintiff complained of not only headache pain on this date, but also neck pain. This was the first documentation of any neck pain complaints by plaintiff. Plaintiff further indicated that the neck pain appeared on May 12, 2001 and was still present at the time of that examination. Plaintiff related several potential causes of his headache and neck pain, including three previous motor vehicle accidents, and that his job duties included working with electric motors and moving large equipment. He did not report to Ms. Alexander that he injured himself at work while lifting an exhaust fan six days earlier on May 8, 2001.
4. Ms. Alexander diagnosed muscle spasm in the neck along with a migraine headache. She performed an injection for the migraine headache and prescribed medications. She released plaintiff to return to work light duty instead of taking him out of work because plaintiff explained he had a new job, his wife had left him, and financially he needed to work. Although Ms. Alexander discussed antidepressants, plaintiff declined medication for depression.
5. Plaintiff testified at the Deputy Commissioner hearing that he reported his work injury to his employer after being placed on light duty by Ms. Alexander on May 14, 2001. However, Mr. Blakley testified that while he was aware that plaintiff was complaining of headaches and neck pain as of Friday, May 11, 2001, he did not know that plaintiff was alleging a work-related accident as the cause for those problems until May 23, 2001 at which time Mr. Blakley completed an accident report pursuant to company policy. Mr. Bill Williamson, defendant-employer's human resource manager, testified that plaintiff did give him a light duty work note on May 15, 2001 but did not report any alleged work accident at that time.
6. Plaintiff saw Ms. Alexander on two other occasions for treatment over the next week. Because plaintiff continued to experience neck pain and pain and numbness into his left arm, Ms. Alexander referred plaintiff to Dr. David P. Fedder, an orthopedic surgeon in Pinehurst. Dr. Fedder examined plaintiff on May 24, 2001, and after taking x-rays, diagnosed mild arthrosis at C5-6 and a cervical strain. He suggested physical therapy and instructed plaintiff to remain on light duty work.
7. Dr. Flannery of Richmond Internal Medicine first saw plaintiff on June 7, 2001. Plaintiff reported to Dr. Flannery that he originally experienced pain in his neck after lifting a motor at work. Dr. Flannery noted in this examination that plaintiff was having muscle spasms, his neck was turned, his muscles were tense, and his side was stiff. Dr. Flannery felt plaintiff had a herniated disc or possibly a bad muscle spasm.
8. Dr. Flannery saw plaintiff again on June 20, 2001 at which time plaintiff continuined to experience neck pain radiating into his left side and back. Dr. Flannery felt a neck MRI should be done and that plaintiff should be referred to a specialist. Dr. Flannery continued to see plaintiff, and saw him for the last time on October 10, 2001 when he referred plaintiff to the orthopedists at Miller Clinic and to an anesthesiologist for pain management.
9. Dr. Flannery stated in his deposition that he was a little surprised that plaintiff did not have neck pain until three days after the lifting incident, but that some injuries do not hurt immediately. Dr. Flannery believed that plaintiff reinjured his neck when he lifted the heavy motor and significantly aggravated or exacerbated his preexisting neck condition.
10. Plaintiff was then seen by Dr. John A. Welshofer, an orthopedic surgeon in Charlotte, on July 10, 2001. He reviewed a recently taken MRI, noting that the MRI revealed degenerative changes at C5-6, but no evidence of herniation. Dr. Welshofer also diagnosed a cervical sprain. Dr. Welshofer later ordered nerve conduction studies, which he reviewed on September 7, 2001 and which he believed showed evidence of a left elbow neuropathy, but did not show any significant cervical nerve impingement. Dr. Welshofer recommended a CT scan, but that test was never administered. Plaintiff did not return to see Dr. Welshofer, who had him remain on light duty work restrictions throughout his course of treatment.
11. On August 15, 2001 plaintiff ceased working because defendant-employer no longer had a light duty position available.
12. On October 22, 2001 plaintiff was seen by Dr. Dion J. Arthur, an orthopedist with a specialty in spinal surgery. Plaintiff complained of severe neck and arm pain and related to Dr. Arthur that he sustained an injury while lifting a motor off a roof and within two days developed worsening neck and left arm pain. After reviewing plaintiff's MRI results, Dr. Arthur diagnosed a C5-C6 radiculopathy with foraminal stenosis, disc herniation, osteophyte formation, shingling into the spinal canal, spinal cord compression, as well as nerve root impingement with neurologic deficit. Dr. Arthur stated that plaintiff was unable to work due to development of nerve damage which would have been aggravated or accelerated by any type of work activity.
13. Because plaintiff had obtained no relief after six months of conservative treatment, Dr. Arthur recommended surgery, which was performed three weeks later on November 14, 2001. Dr. Arthur noted in his operative report that he found a herniated disc at C5-6, massive shingling osteophytes encroaching into the spinal canal, and a large bony spike was noted impinging the exiting nerve root at C5-6 on the left side.
14. Dr. Arthur felt based on plaintiff's history of no prior notable neck or arm problems, the clinical correlation during his examinations of plaintiff, diagnostic test results and interoperative findings, that plaintiff's neck condition was the result of the lifting incident on May 8, 2001. Dr. Arthur further stated that if the weight of the motor were more than 250 pounds, that would reinforce his causation opinion.
15. Following plaintiff's recovery from surgery, Dr. Arthur released plaintiff to light duty work on February 4, 2002. Plaintiff was interested in returning to work but defendant-employer had no light duty work available. Dr. Arthur recommended vocational rehabilitation.
16. Dr. Arthur explained in his deposition that he did not assign a medical disability rating to plaintiff because it is not his practice to do so. Plaintiff was not at maximum medical improvement at the time of Dr. Arthur's deposition on March 21, 2002. Plaintiff has not received any permanent partial impairment rating.
17. The Deputy Commissioner did not find plaintiff's testimony credible and assigned great weight to plaintiff's failure to report a work injury when he first sought medical treatment from physician's assistant Alexander. It appears from plaintiff's testimony that he was not sure initially what triggered his neck pain. Despite three prior motor vehicle accidents, plaintiff was able to work and had not experienced this level of neck pain prior to the May 8, 2001 lifting incident. Plaintiff's description of the lifting incident was very similar to the account given by his supervisor, Mr. Blakely. Plaintiff was consistent in his description of the lifting incident of May 8, 2001 to Drs. Flannery and Arthur.
18. The Full Commission finds plaintiff to be credible and gives greater weight to the opinions of Dr. Flannery and Dr. Arthur than to the opinions of Ms. Alexander, who at the time she treated plaintiff had been working as a physician's assistant for only four months.
19. As the result of the injury by accident on May 8, 2001 plaintiff sustained a significant aggravation or exacerbation of his preexisting degenerative neck condition and was unable to earn wages in his regular or any other employment from August 15, 2001 and continuing at the time of the Deputy Commissioner hearing.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. On May 8, 2001 plaintiff sustained a compensable injury by accident in that he sustained a specific traumatic incident of the work assigned arising out of and in the course of his employment with defendant-employer. N.C. Gen Stat. § 97-2(6).
2. As the result of the compensable injury by accident and surgery, plaintiff was disabled and is entitled to temporary total disability compensation at the weekly rate of $333.35 from August 15, 2001 until plaintiff returns to work or further order of the Industrial Commission. N.C. Gen. Stat. § 97-29.
3. There has been no determination what, if any, permanent partial disability plaintiff may have sustained as a result of the compensable injury by accident. N.C. Gen. Stat. § 97-31.
4. Plaintiff is entitled to have defendants pay for all medical treatment related to his compensable injury by accident so long as such treatment may reasonably be required to effect a cure, give relief and will tend to lessen plaintiff's disability. N.C. Gen. Stat. §§ 97-25; -25.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to attorney's fees approved below, defendants shall pay plaintiff temporary total disability compensation in the amount $333.35 per week beginning August 15, 2001 and continuing until plaintiff returns to work or further order of the Industrial Commission. All sums that have accrued shall be paid in one lump sum.
2. Defendants shall pay for all medical expenses incurred or to be incurred by plaintiff as a result of the compensable injury.
3. A reasonable attorney's fee in the amount of twenty-five percent (25%) of the compensation benefits due plaintiff is approved for plaintiff's counsel and shall be paid directly to plaintiff's counsel. All attorney's fees due on accrued compensation shall be paid in one lump sum.
4. In the event the parties are unable to agree on the amount of permanent partial disability, if any, due plaintiff as a result of the compensable injury by accident, either party may file a Form 33, Request for Hearing, with the Commission.
5. Defendants shall pay the costs of this action.
This the ___ day of January 2003.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/_______________ RENEE C. RIGGSBEE COMMISSIONER
LKM/kjd